UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

——————————————————————X

NANCY I. LOZADA,

                Plaintiff,

        -against-

JOHN E. POTTER, Postmaster General,

                Defendant.

——————————————————————X

FEUERSTEIN, J.

**OPINION & ORDER**
**CV-07-4813 (SJF)(WDW)**

On November 19, 2007, plaintiff Nancy I. Lozada ("plaintiff") commenced this action against defendant John E. Potter, Postmaster General ("defendant"), alleging employment discrimination based upon gender and national origin in violation of, *inter alia*, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.* Defendant now moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Rule 56"), for summary judgment dismissing the complaint. For the reasons set forth herein, defendant's motion is granted in part and denied in part.

I.      BACKGROUND

    A.    Factual Background[1]

Plaintiff is a Hispanic woman born in Chicago, of Puerto Rican ancestry. She is between five (5) feet two (2) inches and five (5) feet three (3) inches tall.

_____

[1] The facts are derived from the pleadings, the parties' Local 56.1 statements and the affidavits and declarations, with exhibits, submitted by the parties in their respective motion papers. The facts are undisputed, unless otherwise indicated.

I.    The Huntington Station Post Office

The Huntington Station post office is comprised of three (3) delivery units: Huntington Station, Melville and Dix Hills, which, combined, consist of over eighty (80) routes. (Defendant's Statement Pursuant to Local Civil Rule 56.1 [Def. 56.1 Stat.], ¶¶ 1-2; Plaintiff's Reply Statements of Uncontroverted Material Facts [Plf. 56.1 Reply], ¶¶ 1-2). At all relevant times, Gregory Gallienne ("Gallienne") was the postmaster of the Huntington Station post office. (Def. 56.1 Stat., ¶¶ 3-4; Plf. 56.1 Reply, ¶¶ 3-4). Each letter carrier and part-time flexible ("PTF") letter carrier of each delivery unit are supervised by a customer service supervisor assigned to that respective unit. (Def. 56.1 Stat., ¶¶ 5, 57; Plf. 56.1 Reply, ¶¶ 5, 57). From September 2006 through November 2006, Janine Ramos ("Ramos") supervised the letter carriers and PTF letter carriers assigned to the Huntington Station delivery unit. (Declaration of Janine Ramos [Ramos Decl.], ¶ 32). In addition to supervising the letter carriers and PTF letter carriers, the customer service supervisor's duties include: overseeing mail flow inside the supervisor's assigned delivery unit; ensuring the accurate and timely delivery of mail on the street; scheduling and assigning work to PTF letter carriers; and observing job performance of the letter carriers and PTF letter carriers, both inside the post office and on the street, and reporting those observations to Gallienne. (Def. 56.1 Stat., ¶¶ 6-7; Plf. 56.1 Reply, ¶¶ 6-7).

According to defendant, the duties of a full-time letter carrier and a PTF letter carrier "are essentially the same, that is, casing or racking mail (i.e. sorting mail inside the post office for street delivery) and delivering mail on the street," with the exception, *inter alia*, that only PTF letter carriers deliver Sunday express mail. (Ramos Decl., ¶ 10; Def. 56.1 Stat., ¶ 10; Plf. 56.1 Reply, ¶ 10). However, plaintiff contends that she was assigned to at least seventeen (17)

2

different routes while employed as a PTF letter carrier at the Huntington Station post office, while full-time letter carriers and PTF letter carriers who were not from Puerto Rico employed at that post office would "case and deliver mail" on only one (1) route. (Declaration of Nancy Lozada [Plf. Decl.], ¶¶ 2, 4-7). A PTF letter carrier may be assigned by a customer service supervisor to any of the three (3) delivery units of the Huntington Station post office on any given day to perform letter carrier duties based on the operational needs of the United States Postal Service ("USPS"), i.e., to substitute for an employee absent due to illness, vacation or other personnel need. (Def. 56.1 Stat., ¶¶ 11-12; Plf. 56.1 Reply, ¶¶ 11-12). In addition, a PTF letter carrier may be assigned to case and/or deliver a portion of a particular route due to excessive mail volume, emergencies, etc.; to deliver express mail seven (7) days a week; and/or to collect/deliver mail from, or to, a relay box. (Def. 56.1 Stat., ¶¶ 13-15; Plf. 56.1 Reply ¶¶ 13-15).

Generally, during the course of an eight (8) hour workday, a letter carrier both cases the mail on his or her delivery route inside the post office and delivers it on the street. (Def. 56.1 Stat., ¶18; Plf. 56.1 Reply, ¶ 18). The casing time may vary depending upon daily mail volume, (Def. 56.1 Stat., ¶ 19; Plf. 56.1 Reply, ¶ 19), but, according to defendant, the delivery time remains fixed. (Ramos Decl., ¶ 21). According to plaintiff, the delivery times contained in the USPS's computerized Delivery Operations Information System ("DOIS") are not fixed, but are only projections used to estimate a letter carrier's daily workload. (Plf. 56.1 Reply, ¶ 20). According to defendant, the USPS utilizes the DOIS to monitor each letter carrier's and PTF letter carrier's office time and street time to ensure timely, accurate and efficient delivery of the mail. (Ramos Decl., ¶ 25). However, plaintiff maintains that the DOIS is only used by the

3

supervisors to estimate or project office and delivery times. (Plf. 56.1 Reply, ¶ 24).

Defendant contends that the daily casing time inside the post office for a particular route is allotted in accordance with a standardized pace for all letter carriers and PTF letter carriers known as the "18-8 standard," i.e., the letter carrier or PTF letter carrier must case either eighteen (18) letters or eight (8) flats (i.e., magazines or oversized envelopes) per minute. (Ramos Decl., ¶¶ 22-23). In response, plaintiff cites to, *inter alia*: (1) Section 242.332 of "Handbook M-39," which states that "[n]o carrier shall be disciplined for failure to meet standards, except in cases of unsatisfactory effort which must be based on documented, unacceptable conduct that led to the carrier's failure to meet office standards," (Plf. 56.1 Reply, Ex. 8); and (2) a sample "Employee Evaluation and/or Probationary Report" (PS Form 1750), which instructs supervisors, *inter alia*, that "[t]he performance levels of the new employee during the probationary period must not be compared with those of experienced employees," (Plf. 56.1 Reply, Ex. 9). According to defendant, if mail volume is excessive on any given day, a letter carrier or PTF letter carrier may be provided with casing assistance so that he or she can depart to the street and maintain the allotted street delivery time. (Ramos Decl., ¶ 24). Plaintiff admits that casing assistance was provided if mail volume was excessive, but contends that it was so that the carrier could maintain "projected" delivery times, not "allotted" or fixed delivery times. (Plf. 56.1 Reply, ¶ 23).

A letter carrier is required to swipe a personal identification card a minimum of four (4) times daily: (1) when his or her tour begins; (2) upon leaving the post office to begin street duties; (3) upon returning from the street; and (4) when his or her assigned tour ends. (Def. 56.1 Stat., ¶ 25; Plf. 56.1 Reply, ¶ 25). In addition, if a letter carrier's assignment changes during the day, he or she may be required to make additional swipes of his or her personal identification

4

card. (Def. 56.1 Stat., ¶ 25; Plf. 56.1 Reply, ¶ 25). According to defendant, personal identification cards are held inside the post office by the customer service supervisor of the delivery unit to which a letter carrier is assigned.[2] (Ramos Decl., ¶ 27).

In addition, a letter carrier is required to complete seven (7) scans daily with a device that tracks the progress of the street delivery time: (1) at the "hot case," where previously mis-sorted mail, having being re-sorted, is picked up for delivery; (2) upon departing the post office to the carrier's assigned route; (3) at the first delivery location of the day; (4) before lunch; (5) after lunch; (6) at the last delivery location of the day; and (7) upon returning to the post office.[3] (Ramos Decl., ¶ 28). According to defendant, the scan system allows for a daily twenty (20) minute over/under variance for each mail delivery route to account for unforseen circumstances on any particular day[4]. (Ramos Decl., ¶ 30). Scanning on the street is performed by letter carriers and PTF letter carriers at designated locations either inside a business or inside a residential mail box. (Ramos Decl., ¶ 29). According to plaintiff, anyone could access the scanning labels and pull them out. (Plf. Decl., ¶ 13). Letter carriers and PTF letter carriers are trained to utilize both the "swipe" and "scan" systems. (Def. 56.1 Stat., ¶ 30; Plf. 56.1 Reply, ¶ 30).

According to defendant, "[a] PTF carrier may be required to deliver mail in her personally owned vehicle ("POV") because the [USPS] cannot guarantee every PTF letter carrier the use of

---

[2] Although plaintiff conclusorily denies this assertion, she does not otherwise indicate where personal identification cards are held. Rather, she merely asserts, *inter alia*, that once she received her card, she would make the swipes. (Plf. 56.1 Reply, ¶ 26).

[3] Plaintiff also conclusorily denies this assertion, but offers no evidence to refute it.

[4] Plaintiff denies this assertion on the basis that the times in the DOIS system are only projections, not fixed times, and do not apply to probationary employees like plaintiff. (Plf. 56.1 Reply, ¶ 29).

a [USPS] vehicle," (Ramos Decl., ¶ 17), and will be reimbursed for such use of her POV, (Def.

56.1 Stat., ¶ 17; Plf. 56.1 Stat., ¶ 17). However, plaintiff notes, *inter alia*, that Section 4 of the

2001-2006 National Agreement between the National Association of Letter Carriers ("NALC")

and the USPS ("the National Agreement") states, in relevant part, as follows:

> "1. The furnishing of a vehicle by a city carrier for transportation to and from the route shall be voluntary; no carrier may be coerced into furnishing a vehicle or carrying passengers or relays without the carrier's consent. A written authorization (Form 1311) shall be executed by the installation head in every instance, with a copy of said authorization to be retained by the installation head and the carrier. Carriers shall not drive their cars to and from the route for their own personal convenience.
>
> * * *
>
> 3. All carriers furnishing a vehicle for transporting themselves, passengers and mail to and from the assigned routes shall be reimbursed on a mileage-zone basis as [set forth herein]."

(Plf. 56.1 Reply, Ex. 5).

### 2.  Plaintiff's Employment

Between 2003 and 2006, plaintiff was employed by the USPS as a "casual employee" in

Puerto Rico. (Def. 56.1 Stat., ¶ 31). According to plaintiff, she occasionally cased the mail in

Puerto Rico, but she never scanned the "hot case" and, thus, did not perform the same duties in

Puerto Rico as were expected of her in Huntington Station. (Plf. Decl., ¶ 15). During her three

(3) years with the USPS in Puerto Rico, plaintiff worked under six (6) six-month contracts,

alternating between letter carrier and clerk positions. (Def. 56.1 Stat., ¶ 32; Plf. 56.1 Reply, ¶

32).

In 2006, plaintiff applied for a position with the USPS in several locations. (Def. 56.1 Stat., ¶ 33; Plf. 56.1 Reply, ¶ 33). Plaintiff chose to work in New York because the USPS's personnel office in the Long Island district contacted her first. (Def. 56.1 Stat., ¶ 34; Plf. 56.1 Reply, ¶ 34). In September 2006, plaintiff moved from Puerto Rico to New York. (Def.. 56.1 Stat., ¶ 36; Plf. 56.1 Reply, ¶ 36). Plaintiff did not own an automobile during the time that she lived in New York. (Def. 56.1 Stat., ¶ 38; Plf. 56.1 Stat., ¶ 38).

On September 2, 2006, plaintiff commenced her employment with the USPS in New York as a PTF letter carrier. (Def. 56.1 Stat., ¶ 39; Plf. 56.1 Reply, ¶ 39). Article 7 of the National Agreement defines a part-time employee as an employee "assigned to regular schedules of less than forty (40) hours in a service week, or * * * available to work flexible hours as assigned by the Employer during the course of a service week." (Declaration of James H. Knapp [Knapp Decl.], Ex. C). Accordingly, as a PTF letter carrier, plaintiff was not guaranteed a set work schedule in terms of either a fixed number of days per week or a particular time of day for her respective shift. (Def. 56.1 Stat., ¶ 47; Plf. 56.1 Stat. ¶ 47). Notwithstanding her position as a PTF letter carrier, plaintiff routinely worked five (5) days per week, at least eight (8) hours per day, and overtime. (Def. 56.1 Stat., ¶ 48; Plf. 56.1 Reply, ¶ 48). Under the National Agreement, plaintiff was subject to a ninety (90) day probationary period. (Def. 56.1 Stat., ¶ 41; Plf. 56.1 Reply, ¶ 41).

Plaintiff was assigned to the Huntington Station post office, where she worked in all three (3) delivery units based on the needs of the USPS. (Def. 56.1 Stat., ¶¶ 35, 53-54; Plf. 56.1 Reply, ¶¶ 35, 53-54). Accordingly, plaintiff's immediate supervisor varied depending upon which route she was assigned on a given day. (Def. 56.1 Stat., ¶ 58; Plf. 56.1 Reply, ¶ 58).

7

Between September 6, 2006 and September 12, 2006, plaintiff participated in an employee orientation program held off-site from the Huntington Station post office. (Def. 56.1 Stat., ¶ 43; Plf. 56.1 Reply ¶ 43). On September 13, 2006, plaintiff commenced working as a PTF letter carrier at the Huntington Station post office. (Def. 56.1 Stat., ¶ 44; Plf. 56.1 Stat., ¶ 44). Plaintiff contends that she was not provided with a personal identification card during her first three (3) weeks of work and that her supervisors manually entered her information in the computer. (Plf. Decl., ¶¶ 10, 25).

Plaintiff trained for four (4) days with an on-the-job trainer ("OJT") on, *inter alia*, casing mail and delivering it on the street. (Def. 56.1 Stat., ¶ 45; Plf. 56.1 Reply, ¶ 45). Defendant contends that part of plaintiff's training also included the scanning procedures utilized by the USPS. (Ramos Decl., ¶ 37; Excepts of transcript of plaintiff's deposition testimony [Plf. Dep.], Knapp Decl., Ex. A, pp. 57-58). However, plaintiff testified at her deposition that notwithstanding her request for additional training because "here the job was totally different," Stewart Rubin[5] ("Rubin") told her that he was not going to train her further because she had prior experience working in Puerto Rico. (Plf. Dep., Plf. 56.1 Reply, Ex. 21, p. 59).[6] Plaintiff further testified that Deborah Short ("Short") showed her how to scan her progress throughout the day on delivery route 59 and that such progress scanning is done for each route, although the actual

---

[5] Mr. Rubin supervised plaintiff's immediate supervisor at the Huntington Station post office. (USPS EEO Investigative Affidavit of Stewart Rubin [Rubin EEO Aff.], Plf. 56.1 Reply, Ex. 2). In addition, Rubin was the designated postal official tasked with conducting evaluations of the probationary employees at the Huntington Station post office. (Plf. 56.1 Reply, Ex. 12).

[6] Although Rubin disputes this assertion, (Rubin EEO Aff., Plf. 56.1 Reply, Ex. 2), since I must view all evidence in a light most favorable to plaintiff on this motion for summary judgment, I assume plaintiff's assertion to be true for purposes of this motion only.

scanning process is unique for each route. (Plf. Dep., Knapp Decl, Ex. A, p. 57). In addition, plaintiff maintains that after she told Rubin that she could not find some of her scanning labels, he told her to forget about scanning. (Plf. Decl., ¶ 14).

On September 28, 2006, Rubin called plaintiff into his office and told her that she "wasn't doing the job on time" and was asking for too much help because she had requested help approximately five (5) times in a two (2) week period. (Plf. Dep., Knapp Decl., Ex. A, p. 124). Following that meeting, plaintiff was re-trained with another OJT, "Mike," who trained her on delivery route 13. (Id. at 124-125; see Ramos Decl., ¶ 42). According to plaintiff, Mike reported to Rubin that she failed to keep pace with him while delivering the mail. (Id. at 125-127). Thereafter, Rubin met with plaintiff and told her that Mike complained that she had an attitude problem and was not walking at Mike's same pace. (Id. at 127). Plaintiff contends that Mike is "a very tall male," whereas she is only five (5) feet two (2) inches tall, and, thus, it was difficult for her to keep up with his pace. (Plf. Decl., ¶ 19; Def. 56.1 Stat., ¶ 51; Plf. Reply, ¶ 51). According to plaintiff, the USPS does not have a standard pace for walking while delivering mail. (Plf. Decl., ¶ 20).

At her deposition, plaintiff testified that Rubin advised her that shorter women, such as plaintiff, would have to walk one hundred eight (108) paces per minute in order to keep up with a man or with a taller person. (Plf. Dep., Knapp Decl., Ex. A, pp. 156-157). In his EEO affidavit, Rubin admitted that, in an effort to help plaintiff, he advised her to walk one hundred eight (108) paces per minute and that he stated to plaintiff that shorter women would have to walk more steps than a taller person because "[s]horter people like me do have to walk faster, it is physics. We have to take more steps to keep up with someone who is taller." (Plf. 56.1 Reply, Ex. 2).

9

On October 13, 2006, plaintiff was assigned to case and deliver mail on delivery route 20, within the Huntington Station delivery unit. (Ramos Decl., Ex. A). According to defendant, based upon the mail volume that day, the allotted time for casing mail in the post office was two (2) hours and forty-two (42) minutes, yet plaintiff required three (3) hours and fifty-six (56) minutes to case the mail and required three (3) hours and twenty-six (26) minutes of assistance from another letter carrier to complete the task. (Ramos Decl., ¶¶ 44-46, Ex. A). Moreover, defendant contends that a "piece" of the street delivery was also reassigned from plaintiff to another letter carrier in order to ensure the timely street delivery of that route. (Ramos Decl., ¶ 48). Although the street delivery time allotted for plaintiff's piece of the route was four (4) hours and ten (10) minutes, plaintiff required five (5) hours and twenty (20) minutes to complete her piece of the route.[7] (Ramos Decl., ¶¶ 49-50). Plaintiff asserts that she "called the station to report [herself] before 3:00 p.m. as part of [her duties]. When [she] spoke to Sharmin 204B[[8]] She told [plaintiff] that [she] was doing well and that even the regular carrier would get lost on the routes but that she was going to send someone to help [plaintiff] anyway because she had several carrier's coming in early." (Plf. Decl., ¶ 21).

On October 19, 2006, plaintiff was assigned to case and deliver the mail along delivery route 70, within the Huntington Station delivery unit. (Ramos Decl., Ex. B). According to defendant, plaintiff had been assigned to delivery route 70 on eight (8) previous occasions.

---

[7] Plaintiff notes that she was not the only letter carrier who required assistance on October 13, 2009, as the record indicates that five (5) other delivery routes also required assistance and that regular letter carriers also failed to complete their routes within the DOIS projected times. (Plf. 56.1 Reply, ¶¶ 64-66).

[8] Plaintiff does not explain who this is or what position this person held.

(Ramos Decl., ¶ 53). Plaintiff admits to having been assigned to delivery route 70 on previous occasions, but contends that she did not initially complete the route for several reasons. (Plf. Decl., ¶ 23). Defendant contends that the allotted time for casing the mail in the post office was four (4) hours and forty-seven (47) minutes, but plaintiff required five (5) hours and eleven (11) minutes and the assistance of two (2) other letter carriers for an hour each to complete the task.[9] (Ramos Decl., ¶¶ 54-56). Plaintiff missed two (2) scan points along her delivery route. (Def. 56.1 Stat., ¶ 74; Plf. 56.1 Reply, ¶ 74).

On October 23, 2006, plaintiff was assigned to case and delivery mail along delivery route 18, within the Huntington Station delivery unit. (Ramos Decl., ¶ 59). The time allotted for casing the mail in the post office that day was three (3) hours and twenty-four (24) minutes, but plaintiff required five (5) hours and one (1) minute to complete the task. (Id., ¶¶ 60-61). While delivering the route, plaintiff missed the "depart to street" scan. (Id., ¶ 62).

On October 24, 2006, the USPS issued plaintiff a gasoline card to refuel the USPS vehicle she was operating that day. (Def. 56.1 Stat., ¶ 79; Plf. 56.1 Reply, ¶ 79). Plaintiff lost the gasoline card while delivering the mail along her assigned route. (Def. 56.1 Stat., ¶ 80; Plf. 56.1 Reply, ¶ 80). According to plaintiff, her supervisors advised her not to worry about losing the card because it happened frequently with no disciplinary action taken. (Plf. Decl., ¶ 28). Plaintiff recovered the gasoline card from a mailbox along the route the following day. (Def. 56.1 Stat., ¶ 81; Plf. 56.1 Reply, ¶ 81).

On October 28, 2006, plaintiff was assigned to case and deliver mail along delivery route

---

[9] Plaintiff notes that another letter carrier took even longer than she did to complete her task. (Plf. 56.1 Reply, ¶ 70).

18, within the Huntington Station delivery unit. (Ramos Decl., ¶ 63, Ex. D). The time allotted for the street delivery on that route that day was four (4) hours and fifty-eight (58) minutes, but plaintiff delivered only a piece of the route in four (4) hours and thirty-eight (38) minutes and required two (2) hours and eighteen (18) minutes of assistance from another letter carrier to complete the delivery of that route. (Ramos Decl., ¶¶ 64-65).

On October 30, 2006, plaintiff was assigned to case and deliver mail along delivery route 38, within the Huntington Station delivery unit. (Def. 56.1 Stat., ¶ 86; Plf. 56.1 Reply, ¶ 86). According to defendant, the time allotted for casing the mail on that route that day was three (3) hours and six (6) minutes, but plaintiff required four (4) hours to complete the task.[10] (Ramos Decl., ¶¶ 68-69). Defendant further maintains that the time allotted for the street delivery of the mail on that route that day was five (5) hours and nineteen (19) minutes, but plaintiff only delivered a piece of the route in five (5) hours and fifteen (15) minutes and required one (1) hour of assistance from another letter carrier to complete the delivery of that route. (Ramos Decl., ¶¶ 70-71). In addition, defendant asserts that plaintiff missed three (3) scan points on that route. (Ramos Decl., ¶ 72).

On November 3, 2006, plaintiff completed and signed PS Form 2574, entitled "Resignation from the Postal Service," in which she indicated that she was resigning because she has "to [sic] much stress because [she] left [her] family in Puerto Rico." (Knapp Decl., Ex. D). On that same date, plaintiff received notification that she was being separated from the USPS, effective that day, because she "failed to meet the expectations of the position [she] was hired for

---

[10] Plaintiff notes that her time was comparable to that of a regular carrier. (Plf. 56.1 Reply, ¶ 87).

* * * [and] because the work [she] did perform was not up to standards." (Plf. 56.1 Reply, Ex. 17).

On November 16, 2006, plaintiff submitted form PS-2564A, entitled "Information for Pre-[EEO]Complaint Counseling," claiming that she was forced to resign after two (2) months of "constant hostile treatment and humilliation [sic] because [she] was not as fast as a regular carrier and [she] did not know the NY area because [she] moved from P[uerto] R[ico] * * *." (Knapp Decl., Ex. E). Plaintiff claimed discrimination based upon national origin (Hispanic) and her unfamiliarity with the New York area. (Id.). According to that form, plaintiff first requested an appointment with the EEO's Dispute Resolution Specialist on November 6, 2006, (id.), three (3) days after plaintiff's separation from employment with the Huntington Station post office.

During her deposition, plaintiff testified that she did not think that defendant assigned her particular routes or gave her particular assignments based on her gender or national origin. (Plf. Dep., Knapp Decl., Ex. A, p. 135). Plaintiff concedes as much, but alleges that defendant's evaluation of her as if she was a letter carrier who only performed in one (1) or just a few routes was discriminatory, that defendant discriminated against her because she was short and that defendant disqualified her as a candidate for passing probation because she was from Puerto Rico and left her family in Puerto Rico. (Plf. 56.1 Reply, ¶ 55).


B.    Procedural History

On November 19, 2007, plaintiff commenced this action against defendant alleging

13

employment discrimination based upon her gender and national origin[11] in violation of Title VII.

Defendant now moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing the complaint.

## II.  DISCUSSION

### A.  Standard of Review

Summary judgment should not be granted unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a summary judgment motion, the district court must first "determine whether there is a genuine dispute as to a material fact, raising an issue for trial." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotations and citations omitted); see Ricci v. DeStefano, 129 S.Ct. 2658, 2677, 174 L.Ed.2d 490 (2009) (holding that "[o]n a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." (Emphasis added) (internal quotations and citation omitted)). "A fact is material if it 'might affect the outcome of the suit under governing law.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "Where the record taken as a whole could not lead a rational trier of fact to find for the

---

[11] "National origin" refers not only to the country where a person is born, but also encompasses the country from which a person's ancestors came. See Espinoza v. Farah Mfg. Co., Inc., 414 U.S. 86, 88, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973). Accordingly, although plaintiff was born in the United States, her "national origin" is Puerto Rico because that is from where her ancestors came.

nonmoving party, there is no genuine issue for trial." Ricci, 129 S.Ct. at 2677 (quoting Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

If the district court determines that there is a dispute as to a material fact, the court must then "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment," Spinelli, 579 F.3d at 166 (internal quotations and citation omitted), to determine whether there is a genuine issue for trial. See Ricci, 129 S.Ct. at 2677. The moving party bears the initial burden of establishing the absence of any genuine issue of material fact, after which the burden shifts to the nonmoving party to "come forth with evidence sufficient to allow a reasonable jury to find in [its] favor." Spinelli, 579 F.3d at 166 (internal quotations and citation omitted). Thus, the nonmoving party can only defeat summary judgment "by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of" a factual question that must be resolved at trial. Id. (internal quotations and citations omitted); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

B.    Discrimination Claims

Absent direct evidence of discrimination, which is rarely present, discrimination claims brought pursuant to Title VII are analyzed under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See Terry v. Ashcroft, 336 F.3d 128, 141 (2d Cir. 2003); Davis v. State University of New York, 802 F.2d 638, 642 (2d Cir. 1986). Under the McDonnell Douglas analysis, a plaintiff must first establish a

15

prima face case of discrimination. 411 U.S. 792, 93 S.Ct. 1817. To establish a prima facie claim

of employment discrimination under Title VII a plaintiff must demonstrate: (1) that he or she

belonged to a protected class; (2) that he or she was otherwise qualified for the position; (3) that

he or she suffered an adverse employment action; and (4) that "the adverse action occurred under

circumstances giving rise to an inference of discrimination." Leibowitz v. Cornell Univ., 584

F.3d 487, 498 (2d Cir. 2009); see also Terry, 336 F.3d at 138. The burden of establishing a

prima face case is minimal. Mandell v. County of Suffolk, 316 F.3d 368, 378 (2d Cir. 2003).

Once the plaintiff has established a prima facie case of discrimination, the burden shifts

to the defendant to offer a legitimate, nondiscriminatory reason for its actions. McDonnell

Douglas, 411 U.S. at 802, 93 S.Ct. 1817; Leibowitz, 584 F.3d at 498-499, 503. If the defendant

satisfies its burden, the plaintiff must establish by competent evidence that the defendant's

proffered reason was not its true reason, but merely a pretext for discrimination. McDonnell

Douglas, 411 U.S. at 804, 93 S.Ct. 1817; Leibowitz, 584 F.3d at 499, 504. In order to defeat

summary judgment, the plaintiff must show, by a preponderance of the evidence, circumstances

that "would be sufficient to permit a rational finder of fact to infer that the defendant's

employment decision was more likely than not based in whole or in part on discrimination."

Terry, 336 F.3d at 138; see also Leibowitz, 584 F.3d at 504 ("[P]laintiff carries the ultimate

burden of persuasion and must produce evidence such that a rational finder of fact could

conclude that the adverse action taken against her was more likely than not a product of

discriminatory animus.") "[T]he ultimate burden of persuading the trier of fact that the defendant

intentionally discriminated against the plaintiff remains at all times with the plaintiff."

Leibowitz, 584 F.3d at 499 (quoting Patterson v. County of Oneida, N.Y., 375 F.3d 206, 221 (2d

Cir. 2004)).

Contrary to plaintiff's contention, there is no direct evidence of discrimination based upon her gender and national origin. Accordingly, plaintiff's claims are analyzed under the McDonnell Douglas burden-shifting framework. Defendant does not contest the first three (3) elements of the framework for purposes of this motion, focusing instead on the fourth element, i.e., that the circumstances alleged by plaintiff do not give rise to an inference of discrimination based upon her gender or national origin.

1.    Inference of Discrimination

"[A]n inference of discriminatory intent may be derived from a variety of circumstances, including, but not limited to: 'the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" Leibowitz, 584 F.3d at 502 (quoting Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994)). The focus in all respects is on what motivated the employer, not in the truth of the plaintiff's allegations. Duviella v. Jet Blue Airways, No. 08-2775-cv, 2009 WL 3765938, at * 1 (2d Cir. Nov. 12, 2009).

Plaintiff has not established that any of the conduct of which she complains in the complaint "occurred under circumstances giving rise to an inference of discriminatory intent."

Terry, 336 F.3d at 138. "A showing of disparate treatment[12]–that is, a showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group–is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case [of discrimination]." Mandell, 316 F.3d at 379 (internal quotations and citation omitted). In order to establish a disparate treatment claim, the plaintiff must show that he or she was "similarly situated in all material respects to the individuals with whom [he or] she seeks to compare [himself or] herself." Id. (internal quotations and citation omitted). Generally, the question of whether two employees are similarly situated is a triable issue for the fact finder. Id.; see also Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 790 (2d Cir. 2007); Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000). "But this rule is not absolute and 'a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met.'" Cine SK8, 507 F.3d at 790-791 (quoting Harlen Assocs. v. Incorporated Village of Mineola, 273 F.3d 494, 499 n. 2 (2d Cir. 2001)); see also Spiegler v. Israel Discount Bank of New York, No. 01 Civ. 6364, 2003 WL 21983018, at * 2 (S.D.N.Y. Aug. 19, 2003)(holding that a court can properly grant summary judgment where no reasonable jury could find the similarly situated prong met). "Mere allegations are insufficient to defeat summary judgment." Duviella, 2009 WL 3765938, at * 2; see Fed. R. Civ. P. 56(e); see also Dorfman v. Doar Communications, Inc., No. 05-4926-cv, 314 Fed. Appx. 389, 390 (2d Cir. Mar. 12, 2009) ("A plaintiff cannot establish a *prima facie* case based on purely conclusory allegations of discrimination, absent any concrete particulars." (internal quotations and citation omitted)).

The determination of whether a plaintiff is similarly situated to other individuals in "all

---

[12] Plaintiff has not raised a disparate impact claim.

material respects," varies on a case by case basis, but must be judged based on (1) whether the plaintiff and those individuals whom he or she maintains are similarly situated to him or her were subject to the same workplace standards; and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness. Graham, 230 F.3d at 40. The plaintiff's conduct need not be identical to that of the employee with whom he or she seeks to compare himself or herself in order for the two to be considered similarly situated; rather, there need only be an "objectively identifiable basis for comparability," that is "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases." Id. The determination of whether two acts are of comparable seriousness requires an examination of the acts themselves, as well as of the context and surrounding circumstances in which those acts are evaluated. Id.

Plaintiff has failed to identify any similarly situated male employee or employee who is not of Puerto Rican heritage who was treated differently than she was with respect to any of the conduct of which she complains. Plaintiff identifies only three (3) individuals in her complaint whom she alleges are similarly situated to her: Muntac Qureshi ("Qureshi"), Pearlie Murray ("Murray") and Irene Almeida ("Almeida"). Plaintiff alleges that Qureshi, a male employee, was hired around the same time as she was and, like plaintiff, was given several delivery routes, but was allowed to keep each delivery route for more than one (1) week, whereas plaintiff was never assigned to the same route for more than four (4) days. (Compl., ¶¶ 7, 9). In her declaration submitted in opposition to the motion for summary judgment, plaintiff also alleges that Qureshi received an inferior evaluation, yet, unlike plaintiff, was permitted to pass probation. (Plf. Decl., ¶ 27). Plaintiff alleges that Murray, a female employee of Indian or Pakistani descent, was "extremely slow" on her delivery routes and was evaluated at only thirty (30) days, and not again

19

at sixty (60) or eighty (80) days, as required, but passed probation. (Compl., ¶ 16; see also Plf. Decl., ¶ 27). Plaintiff alleges that Almeida was also hired around the same time as she was, but unlike plaintiff, Almeida was assigned to one (1) route for over a month and was only checked on by her supervisor on one (1) occasion, whereas supervisory personnel checked on plaintiff on a daily basis. (Compl., ¶¶ 8, 27, 28). In her declaration, plaintiff also identifies a fourth individual, Mr. Saeed, with whom she compares herself. Saeed is a PTF letter carrier who, according to plaintiff, had an inferior evaluation, yet managed to pass probation. (Plf. Decl., ¶ 27).

No inference of discrimination can be drawn from plaintiff's allegations regarding the assignment of more favorable delivery routes to Qureshi and Almeida in light of plaintiff's testimony during her deposition that delivery routes were assigned based on the needs of the USPS and that she did not think that defendant assigned her particular routes or gave her particular assignments based on her gender or national origin. (Plf. Dep., Knapp Decl., Ex. A, pp. 53-56, 135). Moreover, in her EEO charge, plaintiff did not allege discrimination based upon delivery route assignments, only that she was forced "to resign * * * because [she] was not as fast [at delivering mail] as a regular carrier and [because she] did not know the N[ew] Y[ork] area [having] moved from P[uerto] R[ico]." (Knapp Decl., Ex. E). Moreover, plaintiff now alleges discrimination based only on: (1) defendant's evaluation of her as if she was a letter carrier who only performed in one (1) or just a few routes; (2) her short stature; and (3) her disqualification as a candidate for passing probation based on her Puerto Rican heritage. (Plf. 56.1 Reply, ¶ 55).

In addition, no inference of discrimination based on gender can be drawn from plaintiff's allegations against Murray and Almeida, who themselves are members of plaintiff's protected

20

class.[13] Notwithstanding plaintiff's subjective characterization of Murray as "extremely slow," she does not proffer any evidence indicating that Murray, Saeed, Qureshi or Almeida were otherwise similarly situated to her in all material respects, i.e., that they required as much additional time as plaintiff to complete their delivery routes, required frequent assistance from other employees to complete their delivery routes, misdelivered the mail, missed scan points on their delivery routes, lost their gasoline card or required re-training in order to complete their job assignments.[14] Accordingly, plaintiff fails to raise an inference of discrimination based upon defendant's purported disparate treatment of the four (4) identified employees.

Although an inference of discrimination can be established other than by an employer's disparate treatment of employees who are not in the plaintiff's protected class, plaintiff has failed to otherwise raise such an inference of discrimination. Contrary to plaintiff's contention, Rubin's comment about shorter women having to walk more paces to keep up with a man or with a taller letter carrier lacks any hint of gender discrimination beyond that provided by mere speculation, especially because Rubin referred to himself as a shorter person who had to walk faster than

---

[13] Furthermore, the record reflects that in addition to plaintiff, six (6) other individuals were discharged from their employment with the USPS at the Huntington Station post office: three (3) males and three (3) females. (Plf. 56.1 Reply, Ex. 12).

[14] Indeed, the record indicates that although Qureshi occasionally required additional time to complete his delivery route(s) during the period from October 11, 2006 through and including October 30, 2006, he more frequently completed his delivery route(s) within the projected time limit and, unlike plaintiff, did not require the assistance of other employees to do so. (Plf. 56.1 Reply, Ex. 7). In addition, although Saeed required an additional two (2) hours and four (4) minutes, plus the assistance of another employee, to complete her delivery route on October 17, 2006, there is no other evidence in the record regarding the time she required to complete her assignments or her daily work performance. (Id.) Moreover, although the record indicates that Murray also required additional time and the assistance of other employees to complete her delivery routes, (id.), she still required less overall time than plaintiff and there is no evidence indicating that Murray ever misdelivered the mail, missed scan points, or required re-training..

21

someone who was taller. See Dorfman, 314 Fed. Appx. at 391.[15]

Plaintiff's allegations: (1) that Rubin did not like her "not because [she] was slow, but because [she] was Puerto Rican, and because [she] was a wife and mother, who had temporarily left [her] home and family in Puerto Rico to work [in New York]," (Compl., ¶ 21); (2) that she "believe[s] that Rubin does not like people of Puerto Rican heritage," (Compl., ¶ 26); and (3) that Rubin "took great offense at [her] life choices," (id.), are not supported by any evidence in the record and are based upon nothing more than plaintiff's speculation. Indeed, plaintiff admits that "[i]t is not clear why Rubin went so out of his way to persecute [her]." (Compl., ¶ 36). Moreover, plaintiff's belief that her status as a mother was a "topic of concern" for the supervisory staff, (Compl., ¶ 23), which is based upon Gallienne's alleged comment to plaintiff "that delivering mail was nothing for [her], the hardest thing was in leaving [her] family behind," (Compl., ¶ 22), are belied by her allegations that on at least two (2) subsequent occasions Gallienne informed plaintiff that she was doing a good job and would likely pass probation. (Compl., ¶¶ 29-30).

Furthermore, a remark by another letter carrier assigned to the Huntington Station post office, Kathy O'Toole, expressing resentment about Hispanic workers from Puerto Rico coming to work for the USPS in New York, (see Affidavit of Carol Brown [Brown Aff.], Plf. 56.1 Reply,

---

[15] Vanguard Justice Soc., Inc. v. Hughes, 471 F.Supp. 670 (D.C. Md. 1979), the District of Maryland case cited by plaintiff in support of her position that a height requirement primarily motivated by a desire to exclude short women violates Title VII, is not only not binding authority on this court, but is also inapposite because, *inter alia*: (1) there is no height requirement alleged in this case, only a stray remark by Rubin referring to plaintiff's height; (2) that case involved a disparate impact claim, not a disparate treatment as alleged here; and (3) there was statistical evidence, as well as direct evidence, that the height requirement in that case was imposed for the very purpose of excluding women, which is absent here.

22

Ex. 23), without more, is insufficient to raise an inference that any of the conduct of which plaintiff complains was motivated by discriminatory animus. Plaintiff does not allege that O'Toole was her supervisor or that she engaged in, or directed, any of the conduct of which plaintiff complains. Thus, the record is bereft of any evidence establishing that O'Toole's alleged animosity towards Hispanic individuals from Puerto Rico was a motivating factor in any of the conduct alleged in plaintiff's complaint. Moreover, Ms. Brown admits that the USPS hired "many" letter carriers similarly situated to plaintiff, i.e., who were hired with the intention of returning to Puerto Rico once they completed their required tenure in New York and had left their families in Puerto Rico during their tenure in New York.[16] (Id.). Plaintiff fails to identify any other PTF letter carrier, or other employee of the USPS, of Puerto Rican heritage whose employment was terminated prior to completing the ninety (90) day probation period or who was denied a transfer from Long Island to Puerto Rico.

Plaintiff's failure to adduce any evidence tending to demonstrate that the conduct of which she complains was influenced by her gender or national origin is fatal to her discrimination claims. See Duviella, 2009 WL 3765938, at * 1.


2.    Non-discriminatory Reason

Even assuming plaintiff established a *prima facie* case of discrimination, defendant has

---

[16] Although Ms. Brown alleges that "many employees," including managers, "seemed to have" a problem with training and investing money in people who would eventually relocate, she identified only one (1) such manager, Guy Turchiano. (Brown Aff., Plf. 56.1 Reply, Ex. 23). Significantly, Mr. Turchiano is assigned to the Patchogue post office, (id.), and, thus, whatever sentiments he may have expressed about employees of Puerto Rican heritage are irrelevant to ascertaining whether the conduct of which plaintiff complains in the Huntington Station post office was motivated by a discriminatory intent.

offered a legitimate, nondiscriminatory reason for the conduct alleged in the complaint, i.e., plaintiff's failure to meet the expectations of the position for which she was hired and her sub-standard work performance despite repeated attempts at re-training, see, e.g. Dorfman, 314 Fed. Appx. at 391, and plaintiff has failed to provide evidence sufficient for a rational finder of fact to find that the proffered reason was pretextual. Although plaintiff alleges that it was not until she commenced her EEO action on November 6, 2006 that defendant first alleged that she had misdelivered the mail; required retraining three (3) times; missed scan points; and was repeatedly late on her delivery routes, (Compl., ¶¶ 40-43; see Knapp Decl., Ex. E), those allegations are belied by the evidence set forth in the record, including, *inter alia*, the USPS's "Separation During Probation," of which plaintiff acknowledged receipt on November 3, 2006, three (3) days prior to her filing of the EEOC charge. (See Plf. 56.1 Reply, Ex. 17). Moreover, Gallienne testified during his deposition that he received "many verbal evaluations" about plaintiff from Ramos, as well as from Rubin and another supervisor, Anthony Messina ("Messina"), and that, although he could not recall the specific conversations with those supervisors, he was left with the impression that plaintiff did not "seem to be making as much progress as was needed," particularly because she required re-training, which is "usually * * * for someone that's [sic] not doing that well," and that plaintiff was repeatedly late. ( Transcript of the Deposition of Gregory Gallienne [Gallienne Dep.], Plf. 56.1 Reply, Ex. 1, pp. 12-14). Ramos also indicates that she periodically consulted with both Gallienne and Rubin regarding plaintiff's job performance. (Ramos Decl., ¶ 40).

Since plaintiff has failed to demonstrate by a preponderance of the evidence that a rational finder of fact could infer that defendant's employment decision was more likely than not

24

based in whole or in part on discrimination based upon plaintiff's gender or national origin, the branch of defendant's motion seeking summary judgment dismissing plaintiff's discrimination claims is granted.

C.    Retaliation Claim

Retaliation claims brought pursuant to Title VII are also analyzed under the burden-shifting framework of McDonnell Douglas, 411 U.S. 792, 93 S.Ct. 1817; see Terry, 336 F.3d at 141. Under the McDonnell Douglas analysis, a plaintiff must first establish a prima face case of retaliation. 411 U.S. 792, 93 S.Ct. 1817. To establish a prima facie case of retaliation under Title VII, an employee must show (1) that he or she participated in a protected activity; (2) that the employer was aware of the protected activity; (3) that the employer took adverse action against the plaintiff; and (4) that a causal connection exists between the protected activity and the adverse employment action. Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005); Terry, 336 F.3d at 141; Raniola v. Bratton, 243 F.3d 610, 624 (2d Cir. 2001). "Title VII is violated when a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause." Terry, 336 F.3d at 140-141 (internal quotations and citation omitted). Although a retaliatory motive must be "at least a substantial or motivating factor behind the adverse action," Raniola, 243 F.3d at 625 (internal quotations and citations omitted), the burden of establishing a prima face case is minimal. Jute, 420 F.3d at 173; Mandell, 316 F.3d at 378. "[T]he court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." Jute, 420 F.3d at 173.

25

Once the plaintiff has established a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its actions. McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817. If the defendant satisfies its burden, the plaintiff must establish that the defendant's proffered reason was merely a pretext for retaliation. Id. at 804, 93 S.Ct. 1817. In order to defeat summary judgment, the plaintiff must show, by a preponderance of the evidence, circumstances "that it would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on [retaliation]." Terry, 336 F.3d at 138.

Defendant contends that plaintiff cannot establish the first and fourth elements of a Title VII retaliation claim, i.e., she did not engage in a "protected activity" and she cannot establish a causal connection between any alleged adverse employment action and her filing of the EEO complaint on November 6, 2006.

1.    "Protected Activity"

Defendant contends that plaintiff cannot demonstrate that she engaged in a "protected activity" because the discrimination of which she complained in the EEO complaint was, in essence, that she was a new resident of Long Island, which is not an actionable form of discrimination under Title VII.

Contrary to defendant's contention, "a plaintiff need not establish that the conduct [s]he opposed was actually a violation of the statute so long as [s]he can establish that [s]he possessed a 'good faith, reasonable belief that the underlying challenged actions of the employer violated th[at] law.'" Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir. 1999)

26

(quoting Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998)); see also Amin v. Akzo Nobel Chemicals, Inc., No. 06-5166, 282 Fed. Appx. 958, 961 (2d Cir. July 22, 2008). It cannot be said as a matter of law that plaintiff did not have a good faith, reasonable belief that defendant forced her to resign because she was from Puerto Rico and that defendant's conduct in doing so violated Title VII. Accordingly, for the purposes of this motion, plaintiff has established that her filing of the EEO complaint on November 6, 2006 was a "protected activity."

### 2. Causal Connection

A plaintiff may establish that retaliation was a "substantial or motivating factor" behind an adverse employment action either (1) "indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by defendant." Raniola, 243 F.3d at 624 (internal quotations and citation omitted).

The only conduct of which plaintiff complains that occurred after her filing of an EEO action was that she was not hired for positions at the Wyandanch and Lindenhurst post offices following interviews. (Compl., ¶¶ 46, 49). The evidence plaintiff proffers in support of this claim is her allegations in her complaint and declaration in opposition to the motion for summary judgment that although Anthony Fantana ("Fantana"), the postmaster at the Wyandanch post office, "liked [her] and was very anxious to hire [her]," he told her that he was told by Carol Anderson and Andy Morescu, presumably employees of the USPS, that he could not hire her because she had filed an EEO grievance. (Compl., ¶¶ 47-48; Plf. Decl., ¶ 28). Plaintiff contends

that Fantana's "admission" constitutes direct evidence of retaliatory animus.

Defendant cursorily contends that plaintiff's allegation is "mere inadmissible hearsay." (Defendant's Reply Memorandum of Law, p. 10). Indeed, plaintiff has not submitted an affidavit by Fantana himself (nor by Anderson or Morescu) attesting to that comment, nor has she identified Fantana, Anderson or Morescu as witnesses she intends to call at trial regarding the reason for defendant's failure to hire her at the Wyandanch post office. (See "Proposed Pretrial Order with plaintiff's schedules" filed on October 13, 2009, Doc. No. 26). Nonetheless, the alleged comment by Fantana is at least arguably admissible at trial as an admission pursuant to Rule 801(d)(2)(D) of the Federal Rules of Evidence. See Garrett v. Garden City Hotel, Inc., No. 05-CV-0962, 2007 WL 1174891, at * 15, n. 12 (E.D.N.Y. Apr. 19, 2007) (stating that the alleged double-hearsay remark by the defendant's executive housekeeper to the plaintiff that the defendant's general manager had instructed him to "fire that black bitch," allegedly referring to the plaintiff, was admissible as admissions of the defendant pursuant to Rule 801(d)(2)(D) of the Federal Rules of Evidence since at the time of the comments, both speakers were employees of the defendant and the alleged comment by the general manager concerned matters within the scope of his employment because it related to a personnel decision, as did the alleged statement by the executive housekeeper relaying the general manager's comment to the plaintiff). Accordingly, plaintiff has established a *prima facie* claim for retaliation.

Since defendant has not proffered any reason for its failure to hire plaintiff at the Wyandanch post office, the branch of its motion seeking summary judgment dismissing plaintiff's retaliation claim based upon the failure to hire her at the Wyandanch post office is denied. Defendant's conclusory suggestion that plaintiff was not hired because of concerns

regarding her ability to arrive to work on time and as scheduled since she did not have a personally owned vehicle, (Defendant's Memorandum of Law in Support of Motion for Summary Judgment [Def. Mem.], pp. 13-14), is unsupported by any evidence in the record.

However, with respect to the position at the Lindenhurst post office, plaintiff only alleges in her complaint that she never received a call back following her interview and that she "believed" the reason was due to retaliation by the USPS. (Compl., ¶¶ 50-51). Plaintiff does not address the failure to hire her in the Lindenhurst post office in either her declaration or in her memorandum of law in opposition to the motion for summary judgment. Plaintiff's speculative allegation in her complaint is insufficient to defeat summary judgment. See Fed. R. Civ. P. 56(e)(2). Since plaintiff has not established a *prima facie* case of retaliation based upon defendant's failure to hire her at the Lindenhurst post office, the branch of defendant's motion seeking summary judgment dismissing that claim is granted.

## III. CONCLUSION

For the reasons set forth herein, the branches of defendant's motion seeking summary judgment dismissing plaintiff's discrimination claims and retaliation claim based upon defendant's failure to hire plaintiff at the Lindenhurst post office are granted and those claims are dismissed, and the branch of defendant's motion seeking summary judgment dismissing plaintiff's retaliation claim based upon defendant's failure to hire plaintiff at the Wyandanch post office is denied. In light of this determination, the parties' joint request for a continuance of the trial scheduled for February 8, 2010 is denied. The bench trial will commence, as scheduled, on

29

the remaining retaliation claim on February 8, 2010 at 10:00 a.m. The parties shall appear via telephone for a pretrial conference on February 4, 2010 at 12:00 noon.

SO ORDERED.

SANDRA J. FEUERSTEIN
United States District Judge

Dated: February 2, 2010
        Central Islip, New York